[L.A. No. 29787. In Bank. Dec. 7, 1972.]

FRANKLIN ALFRED HULLAND, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

Monta W. Shirley for Petitioner.

F. LaMar Forshee, Ronald W. Stovitz and Christopher M. Reuss for Respondent.

## OPINION

**THE COURT.**—This is a proceeding under Business and Professions Code section 6083, subdivision (b) and rule 59(b) of the California Rules of Court to review a decision of the State Bar Disciplinary Board.

Local Administrative Committee Number 6 for Los Angeles County found that petitioner, Franklin Alfred Hulland, in violation of his oath and duties as an attorney,[1] wilfully neglected to render the services for which he was retained and used a confession of judgment and substitution of attorneys adversely to the interest of his client.[2] The committee recommended that petitioner be suspended from practice for 60 days but that suspension be stayed on condition that he comply with the State Bar Act and obey the Rules of Professional Conduct of the State Bar for a two-year probationary period. The Disciplinary Board of the State Bar, modifying the committee's findings of fact, concluded that petitioner violated his oath and duties as an attorney by wilfully failing to render the services for which he was retained, using a confession of judgment to the detriment of his client, and, in addition, improperly delegating functions to lay employees.[3] The board voted to publicly reprove petitioner, two members dissenting on the ground that the discipline was insufficient.

---

[1] Business and Professions Code sections 6067 and 6068.

[2] The committee also found that petitioner violated rule 7 of the State Bar Rules of Professional Conduct by filing a confession of judgment against his client while still her attorney of record and by attempting to collect his fees out of separate property awarded his client in a property settlement agreement when that agreement called for her husband to pay attorney's fees as ordered by the court. It found that petitioner violated section 6128, subdivision (a) of the Business and Professions Code by filing a fraudulent and misleading substitution of attorneys with intent to deceive the court, and that he violated Business and Professions Code section 6128, subdivision (b) by wilfully delaying his client's suit in an attempt to collect his fees out of the separate property. The committee concluded that these acts involved moral turpitude.

[3] The board found that petitioner (a) caused or authorized his lay employees to present his client with a "Request for Services" and a confession of judgment, and (b) ratified his lay employees' act of presenting his client with a substitution of attorneys.

As we explain below, we conclude that public reproval is warranted. Because reproval is sustainable on either of the grounds upon which the committee and the board concur (wilfully failing to render services and wrongfully using a confession of judgment), we need not address the State Bar's contention that improper delegation of functions to lay employees would also support a public reproval in this case.

On February 20, 1967, the complaining witness, Mrs. Kay Sneed, first visited Hulland's office to discuss obtaining a divorce. Hulland was unavailable, however, and she spoke only with Gordon Stater, Hulland's office manager. Stater told her that the charge for preparing initial divorce papers for an in propria persona uncontested divorce was $130 and the fee for complete representation in a contested divorce was $650. She responded that her husband would probably contest the action and that she would need the described complete representation. Stater then had her sign two documents, a "Request for Services" asking for preparation of in propria persona divorce papers, and a confession of judgment in the amount of $650 for "money justly due for legal services."[4] He then told her that the office would proceed with the case only if Hulland accepted it.

On April 3, Mrs. Sneed returned to Hulland's office and gave $130 to Stater to begin preparation of the initial papers. Hulland first saw the "Request for Services" on April 5. He signed this request as accepted, forgetting that Stater had told him that Mrs. Sneed wanted full representation on credit. Stater reminded him of Mrs. Sneed's wishes and showed him the confession of judgment. Stater also told him that Mrs. Sneed had mentioned she would be getting a tax refund check for over $500.

Hulland testified that he interviewed Mrs. Sneed on April 7 or 8, and that she said that she signed the confession of judgment to secure representation, understood he could obtain a judgment against her if she did not pay, and would agree to use her share of the tax check for payment of his retainer. He further testified that he gave her a "Domestic Relations Questionnaire" and asked her to complete it. Mrs. Sneed testified that she did not meet Hulland until June 22, that Stater gave her the questionnaire on an earlier date, and that she never agreed to use the check for Hulland's fee.

On April 14, Mrs. Sneed signed a verification to a complaint and a declaration for order to show cause. These papers were drawn by Donald

[4]The documents were to be used by Stater in the alternative only. Because Mrs. Sneed desired representation in a contested divorce, Hulland's office procedure required that she sign the confession of judgment as a security mechanism for the extension of credit on Hulland's fee. The "Request for Services" was used only if the client desired an in propria persona divorce and the action was to be uncontested.

Durbin, Hulland's associate attorney, and listed Hulland as Mrs. Sneed's attorney. The order to show cause recited that Mrs. Sneed had not personally arranged to pay her attorney's fees.

On April 25, Mrs. Sneed telephoned Hulland, told him that her husband would agree to a settlement and asked him to reduce his fee as the matter would be uncontested. Hulland replied that the charges for the work necessary to complete the divorce would probably equal the $650 fee anyway. After this call Hulland prepared an inter-office communication to Stater listing charges for particular services rendered or to be rendered Mrs. Sneed. Hulland estimated the value of these services at $615, including representation of a default hearing at $250.[5]

On April 29, Mr. and Mrs. Sneed signed a property settlement agreement. Among other things, this agreement provided that the check for the income tax refund was to be Mrs. Sneed's separate property and that, while both Sneeds would remain liable for attorney's fees, Mr. Sneed would pay attorney's fees as awarded by the court.

Shortly before or after signing this agreement, Mrs. Sneed did receive the income tax refund check. Because Hulland's secretary told her that Hulland wanted the check brought to his office for safekeeping, she left the check, unsigned, with his office.

Mrs. Sneed and her corroborating witness met with Hulland on June 22 to go over the testimony for the default hearing. They discussed the refund check at this meeting. Hulland testified that the only mention of the check was a question by Mrs. Sneed as to what would be done about the fact that her husband had not signed it. Mrs. Sneed testified that Hulland demanded that she endorse the tax check over to him for his fees but that she refused to do so.

On Saturday, June 24, when Mrs. Sneed met with Stater in Hulland's office, she pretended to endorse the check, and thereby obtained possession of it. She then placed it in her purse. Stater told her that the check was for attorney's fees and the attorneys would not appear at the default hearing if she took it. She replied that if the attorneys did not appear, she would get an attorney at the Legal Aid Society. Stater then told her that she would be required to sign, and he had her sign a substitution of attorneys. Mrs. Sneed then said that the attorneys "had better be at the hearing if they

---

[5]The communication stated in part: "Following are charges that I would include in Representation Agreement for Mrs. Sneed at $520; Prop. Settlement $125, Costs advanced $40, Default Hearing $250, Prep. of Interloc. $75, Prep. of Final $25, Conferences $100, (Total) $615."

wanted to be paid." Stater answered that she should talk with the attorneys on Monday. She left with the check.

On Sunday, June 25, Stater spoke with Hulland over the phone, and told him that Mrs. Sneed had taken the check and had signed a substitution of attorneys. Hulland instructed Stater to have the default hearing taken off calendar. He did not notify Mrs. Sneed of this action.

On Monday, June 26, Mrs. Sneed and her corroborating witness went to the court house and were informed by the clerk that the hearing had been removed from the calendar. She testified that she then went to Hulland's office and Stater told her that "no one crossed Hulland and got away with it." Stater, however, testified that he did not see Mrs. Sneed on this date. Upon Hulland's arrival at his office later that day, he filed the confession of judgment and was awarded a judgment in the sum of $650 plus interest and costs. Hulland testified he did not file the substitution of attorneys because he felt that Mrs. Sneed would return to his office.

In early July, at Mrs. Sneed's request, an attorney for San Gabriel Valley Neighborhood Legal Aid inquired of Hulland about substituting as attorney in Mrs. Sneed's divorce. Hulland's letter of reply, dated July 24, indicated Hulland still believed himself to be Mrs. Sneed's attorney and that he had not proceeded with the default hearing because she had regained possession of the income tax check.[6]

In November, Hulland filed a partial satisfaction of judgment for $90 (the $130 paid by Mrs. Sneed minus $40 court costs) and caused a writ of execution to issue for $570.50. He thereafter garnished Mrs. Sneed's wages on two occasions; both times the wages were released upon her unopposed claim of exemption.

On May 29, 1968, following Mrs. Sneed's complaint, the State Bar sent Hulland a notice of preliminary investigation. Hulland signed and dated the substitution of attorneys on June 4 and filed it with the court on June 7, 1968.

The local administrative committee found (a) that Hulland refused to conclude the divorce proceedings for the purpose of compelling Mrs. Sneed to turn over the income tax check, (b) that while still her attorney of record he obtained a judgment against her, based on a confession of judgment,

---

[6]Hulland begins this letter with: "It is my understanding that you wish to substitute in *my place* as attorney for Mrs. Sneed. . . ." He goes on to state: ". . . However, when the . . . check bearing her husband's signature was given to her to endorse . . . she put the check in her pocket book . . . then walked out of the office with the check in her possession. *For that reason* we did not go ahead with the Default Hearing." (Italics added.)

when he had wilfully failed to render all of the services for which she had signed the confession; and (c) that he wrongfully filed a substitution of attorneys without his client's consent.

The disciplinary board omitted the committee's finding of a wrongful filing of the substitution and accepted the remainder of the committee's findings with a modification to the effect that Hulland did not proceed with the default hearing because Mrs. Sneed had regained possession of the check.[7] The board concurred with the committee's conclusion that by wilfully refusing to render the services for which he was retained and by using a confession of judgment to the detriment of his client, Hulland violated the oath and duties of an attorney.

*Petitioner wilfully failed to render services for which he was retained.*

Hulland seeks to justify his wilful failure to render the services necessary to complete Mrs. Sneed's divorce by contending that (a) he was discharged, or thought he was discharged, when Mrs. Sneed signed the substitution of attorneys; (b) he had a right to treat his duties at an end because he had an agreement with Mrs. Sneed that the tax check would be used for his fee and her retrieval of the check demonstrated a refusal on her part to recognize any obligation for his fees; (c) he had a possessory lien on the check, Mrs. Sneed wrongfully seized it, and therefore (presumably) he could treat his duties as ended; and (d) he had an agreement with Mr. Sneed that he would not deliver the check to Mrs. Sneed until after the default hearing, and that he could not continue the hearing because he had to notify Mr. Sneed that she had retrieved the check. In our discussion below we shall show that, under the facts of this case, these contentions are unmeritorious.

The evidence does not support Hulland's conclusion that when Mrs. Sneed signed the substitution of attorneys he was discharged, or believed that he was discharged, and therefore was under no obligation to continue rendering services. Thus, Hulland testified he did not file the substitution of attorneys because he thought that she would return to his office. His letter to the Legal Aid Society, written one month after the execution of the substitution, clearly indicates that he believed that he was still Mrs. Sneed's attorney at that time. The evidence also indicates that Mrs. Sneed, by signing the substitution, did not intend to discharge Hulland as her attorney; only after Hulland failed to appear at the hearing did she begin looking for another attorney.

---

[7]The board rejected the conclusion of the committee that these acts constituted a violation of Business and Professions Code section 6128 and rule 7 of the State Bar Rules of Professional Conduct.

Hulland contends that he had a right to treat his duties at an end because he had an agreement with his client that the tax refund check would be used for his fees and that by regaining possession of this check Mrs. Sneed demonstrated a refusal to recognize any obligation for his fees. Yet the only evidence indicating the existence of this alleged agreement is Hulland's own testimony. Mrs. Sneed's testimony directly refutes this allegation. In any event, it is undisputed that Mrs. Sneed signed a confession of judgment for $650, paid petitioner $130 as advancement of his total fee, and signed a property settlement agreement that recited that husband *and wife* would remain liable for attorney's fees. In light of these commitments already made by Mrs. Sneed, the retrieval of the check does not support Hulland's contention that it demonstrated that she had no intention whatsoever of recognizing an obligation for his fees.

Hulland contends that because he had a possessory lien on the check, Mrs. Sneed wrongfully seized it, and, therefore, that (presumably) he had a right to treat his duties at an end. ■ If a possessory lien does exist in California,[8] it does not attach to property coming into the attorney's hands as trustee.[9] Mrs. Sneed left the check with Hulland for "safe keeping" so that he might protect her interest in it; Hulland acquired possession of the check as a trustee, not as security for his fees.

Finally, Hulland alleges that he had an agreement with Mr. Sneed that he would not deliver the check to Mrs. Sneed before the default hearing, and contends that he could not continue with the hearing because he was obliged to notify Mr. Sneed that his client had retrieved the check. No evidence, however, indicates that Hulland tried to contact Mr. Sneed before or after taking the hearing off calendar, that he tried to notify Mrs. Sneed of a delay because of this "agreement" that he had with Mr. Sneed, or that he ever notified Mrs. Sneed of the existence of this "agreement."

■ Wilful failure to perform legal services for which the attorney has been retained in itself warrants disciplinary action, constituting a breach of the good faith and fiduciary duty owed by the attorney to his client. (*Alkow* v. *State Bar* (1971) 3 Cal.3d 924, 935 [92 Cal.Rptr. 278, 479 P.2d 638]; *Simmons* v. *State Bar* (1970) 2 Cal.3d 719, 729 [87 Cal.Rptr. 368, 470 P.2d 352]; *Clancy* v. *State Bar* (1969) 71 Cal.2d 140, 146 [77 Cal.

[8]See 1 Witkin, California Procedure (2d ed. 1971) Attorneys, section 78, page 84, stating that "[d]espite dicta that no such lien exists in California [citations omitted], the question is still open."; and *Isrin* v. *Superior Court* (1965) 63 Cal.2d 153, 157 [45 Cal.Rptr. 320, 403 P.2d 728].

[9]*Id.;* see *Spencer* v. *Spencer* (1967) 252 Cal.App.2d 683 [60 Cal.Rptr. 747] [parties deposited disputed funds in bank in joint names of their attorneys pending resolution of dispute].

Rptr. 657, 454 P.2d 329].) Further, the local committee properly found that petitioner wilfully failed to render the promised services, hoping thereby to compel Mrs. Sneed to turn the check over to him. ■ While the findings of this fact-finding body are not binding on this court, they should be accorded persuasive force and should be entitled to great weight. (*Light* v. *State Bar* (1939) 14 Cal.2d 328, 336-337 [94 P.2d 35]; *Brawner* v. *State Bar* (1957) 48 Cal.2d 814, 818-819 [313 P.2d 1].) The evidence supports the local committee's finding.

■ When an attorney, in his zeal to insure the collection of his fee, assumes a position inimical to the interests of his client, he violates his duty of fidelity to his client. (*Hinds* v. *State Bar* (1941) 19 Cal.2d 87 [119 P.2d 134]; see *McGrath* v. *State Bar* (1943) 21 Cal.2d 737, 741 [135 P.2d 1]; *Lindenbaum* v. *State Bar* (1945) 26 Cal.2d 565, 573 [160 P.2d 9].) ■ Petitioner's wilful failure to render the service for which he was retained and his assumption of a position contrary to his client's interests clearly warrant public reproval.

*Petitioner used a confession of judgment to the detriment of his client.*

We agree with the State Bar that Hulland used the confession of judgment signed by Mrs. Sneed in an oppressive and overreaching attempt to collect unearned fees.

In the instant case, Hulland argues that he was entitled to the sum recited in the confession of judgment signed by Mrs. Sneed when he was discharged from the case. It is not clear whether Hulland contends that, after accepting the case, he was wrongfully discharged and therefore entitled to his full contract fee, or that $650 is the reasonable value of the services he performed before he was discharged for cause. Neither argument is persuasive.

As discussed above, Hulland was "discharged" and Mrs. Sneed began searching for another attorney only after he had wilfully failed to render services for which he was retained. ■ Since this discharge was not without cause, Hulland was entitled only to the reasonable value of his services up to the time of discharge, not the full amount of the contract. (See *Moore* v. *Fellner* (1958) 50 Cal.2d 330 [325 P.2d 857]; *Moser* v. *Western Harness Racing Assn.* (1948) 89 Cal.App.2d 1 [200 P.2d 7].)

In the undelivered communication to Stater[10] Hulland lists the various services necessary to complete Mrs. Sneed's divorce, other than preparation of the initial papers, and the charges that he would make for each of these services. Assuming Hulland rendered every service listed except repre-

---

[10]Footnote 5, *supra*, and accompanying text.

sentation in the default hearing, *by his own estimate* these services would have a reasonable value of only $365. Adding his charge for preparation of initial papers, $130, the value of his services becomes $495. While crediting Mrs. Sneed with $90 (the $130 paid by Mrs. Sneed minus "$40 court costs"), Hulland utilized the confession of judgment in an effort to collect $570.50, rather than $405. In short, Hulland wrongfully sought to collect the full amount of the contract; contrary to his claim, he did *not* attempt to collect the reasonable value of his services.

Surely the legal profession is more than a mere "money getting trade" (A.B.A. Canon 12); it at least requires the rendition of services for any payment received. "Taking money for services not performed or not to be performed is close to the crime of obtaining money by false pretenses, . . ." (1 Witkin, Cal. Procedure (2d ed. 1971) Attorneys, § 202, p. 209; see *Bailey* v. *State Bar* (1930) 209 Cal. 476 [288 P. 433]; *Bruns* v. *State Bar* (1941) 18 Cal.2d 667 [117 P.2d 327]; *Sullivan* v. *State Bar* (1958) 50 Cal.2d 491 [326 P.2d 138].) *Attempting* to collect money for services not to be performed is merely one step removed. The effort to collect unearned fees becomes highly oppressive and detrimental to the client when the attorney arms his demands with the force and weight of a judgment obtained on a confession of judgment, and thus prevents his client from contesting the reasonableness of the fees before judgment enters against her.

▮ Petitioner violated the trust placed in him by his client that he would not use this security device in an oppressive effort to collect unearned fees. On this basis alone public reproval of petitioner is warranted.

Petitioner argues that a confession of judgment is not per se illegal and that to deny its use by attorneys to secure credit for their fees would unduly discriminate against and hamper the profession by foreclosing the extension of credit to the poor. When an extension of credit is secured by a confession of judgment it puts at the disposal of the creditor the most drastic of enforcement proceedings. A confession of judgment forecloses the presentation of any possible defense or controversy for judicial resolution: to the contrary it is a personal admission of a debt obligation upon which the court places its primatur. (*Atlas Credit Corp.* v. *Ezrine* (1969) 25 N.Y.2d 219, 230 [303 N.Y.S.2d 382, 391, 250 N.E.2d 474, 481].) Because the very nature of the confession of judgment is apt to encourage the filing of fraudulent claims against debtors, a majority of states have enacted legislation either banning or restricting its use.[11] The United States Supreme

---

[11]See 21 Syracuse Law Review 197, 199-200, footnotes 18 and 19 (1969) for a collection of state statutes restricting the use of confessions of judgment. Two states go so far as to provide that inclusion of a cognovit clause in a debt instrument is a criminal misdemeanor. (Ind.Ann.Stat. § 2-2906 (Burns 1968); N.M.Stat. Ann. §§ 21-9-16, 21-9-18 (1953).)

Court recently cast serious doubt on the constitutionality, under the due process clause of the Fourteenth Amendment, of cognovit clauses contained in contracts of adhesion, in which there is great disparity in bargaining power and the debtor receives nothing for the cognovit provision. (*D. H. Overmyer Co.* v. *Frick Co.* (1972) 405 U.S. 174, 188 [31 L.Ed.2d 124, 135, 92 S.Ct. 775].)

The extraordinary practice of utilizing a confession of judgment to collect legal fees presents opportunities for overreaching that avoid judicial scrutiny; the practice creates a situation in which the client's ignorance of legal matters makes it unlikely that he will understand the character and effect of the instrument. Moreover, use of a confession of judgment is unnecessary, since a promissory note is equally effective to embody the obligation for legal fees into a readily enforceable form. █ We conclude that the use of a confession of judgment by an attorney to collect his fees for legal services is improper.

It is our conclusion that under the circumstances petitioner should be disciplined by a public reprimand and this opinion shall constitute such reprimand.